UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PERRY A. WARD,

                Plaintiff,

v.

EHW CONSTRUCTORS, et al.,

                Defendants.

CASE NO. C15-5338 BHS

ORDER GRANTING IN PART, DENYING IN PART, AND RESERVING RULING IN PART ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Perry Ward's ("Ward") motion for summary judgment (Dkt. 28). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby rules as follows:

**I. PROCEDURAL HISTORY**

On May 21, 2015, Ward filed a complaint against Defendants EHW Constructors, American Bridge Company, J.V., Nova Group, Inc., and Skanska USA Civil Southeast, Inc. (collectively "EHW") in rem and in personam for personal injury. Dkt. 1. On June 22, 2015, Ward filed an amended complaint alleging that EHW has failed to pay mandatory maritime benefits. Dkt. 12.

On January 14, 2016, Ward filed a motion for summary judgment. Dkt. 28. On February 25, 2016, Ward supplemented his motion. Dkt. 44. On March 14, 2016, EHW responded. Dkt. 48. On March 18, 2016, Ward replied and filed three additional declarations. Dkt. 57.

## II. FACTUAL BACKGROUND

In May 2012, the U.S. Department of Defense awarded EHW the contract to build an explosives handling wharf at Naval Base Kitsap-Bangor. The contract called for EHW to construct a number of structures, including a covered slip long enough for a 560-foot-long submarine, a warping wharf, trestle roads, power utility booms, hardened guard gun positions, and a waterfront support. Dkt. 50, Declaration of William Eskins ("Eskins Dec."), 2.

The wharf project utilized a number of pieces of equipment. Among these were several floating structures, including the *Ringer II*, which was an un-crewed floating platform comprised of interlocking flexi-floats. The flexi-floats are a combination of portable, interlocking modular barges and ancillary attachments, designed for use in inland marine, heavy-construction applications, which, when connected, could reach several hundred feet in length. The group of flexi-floats comprising the *Ringer II* was held in place with anchors or "spuds" then maneuvered at the worksite either by tug or by deck wenches. In addition to the flexi-floats, support skiffs were also used on the project to transport materials and laborers. These skiffs are flat-decked boats; approximately four feet wide and twelve feet in length with a small, 90-horsepower motors. The skiffs were not used to move or reposition the flexi-float barges. *Id*. at 2–3.

On January 14, 2014, EHW hired Ward through Ward's local union for pile drivers. Ward declares that he has been a pile driver for 36 years. Dkt. 30, Declaration of Perry Ward, 2. The parties dispute the type of work Ward performed and whether he qualifies as a seaman. Ward contends that his "work was always completely out on the water, working on vessels doing the pile driving on piles out in the open, navigable waters." *Id*. at 3. Ward further declares as follows:

> All of the above [work] activities were . . . on vessels on the open waterway of Hood Canal, unattached to land, and in navigation for uses and purposes directly related to working on water. I was attached to/assigned to, on a continual basis, these vessels as for purposes of at-sea work and I never worked on land nor was I assigned to work on land. The vessel Ringer II was always at least 300 to 500 yards from shore, and the skiff would work in and around where the Ringer II was. None of my crew were ever even arguably considered to be longshore or State Workers Compensation participants and EHW never suggested or did anything other than treat us as if we were crew members working together on vessels to accomplish the mission and function of those vessels. I have never received any benefits from any Longshore or State program and have never been processed under any of those programs.

*Id*. at 4–5.

On the other hand, EHW contends that Ward was part of a construction crew instead of a seaman. Steve Erickson, EHW's pile driving foreman, declares as follows:

> Two different types of crews worked on the project at Naval Base Kitsap-Bangor. One type of crew manned the vessels. This would include the vessel captains and deckhands. The other type of crew was a construction crew. The construction crews included crane operators, piledrivers, carpenters, and other laborers. The construction crews were responsible for the actual construction of the wharf. The wharf was an extension of land and while the construction crew utilized the crane barges and skiffs to complete their tasks, they were not assigned to operate or maintain the vessels.
> In my role as Piledriver Foreman, I had the opportunity to work with Mr. Perry Ward. Both Mr. Ward and I were a part of the construction crew.

1 All work performed by the crew on which I worked, including the work
performed by Mr. Ward, was for the construction of the wharf.
2
Dkt. 52, Declaration of Steve Erickson, 2.  Mr. Eskins declares as follows:
3
4 All work performed by the crew on which Mr. Ward worked was for
the construction of the wharf. Mr. Ward did not serve on the tug crews that
were used to reposition the RINGER II or other equipment. Mr. Ward's
5 time on barges and skiffs was spent performing work constructing the
Naval wharf.
6 To my recollection, Mr. Ward, as a piledriver, would spend
approximately 80% of his time performing precast and setting work on the
7 pilings for the wharf. This consisted of cutting off piles, using torches on
the piles, and setting pile plugs. He also worked on setting pre-casts for the
8 pilings on concrete. Mr. Ward spent 10 hours a day working for EHW
Constructors. Of that time, approximately 15-30 minutes would be spent on
9 Job Safety analysis meetings on the crane barges, 30 minutes would be
spent for lunch on the barges, and 30 minutes would be spent on the barges
10 for breaks. Mr. Ward would spend approximately another 30 minutes to an
hour on the barges gathering materials for his precasting or performing
11 preparation work on the pilings. All other times were spent on wharf
construction, and he would utilize floating platforms or a work skiff as a
12 work platform to perform his tasks. Mr. Ward was not hired, or responsible,
for piloting or maintaining the barges and tugs used by EHW Constructors
13 on the project. On a rare occasion, he would guide crane operators on the
use of winches to manipulate the crane barges. During those occasions, the
14 barges were anchored.

15 Eskins Dec. at 3–4.

16 On April 14, 2014, Ward was working on a skiff supporting the *Ringer II*.  Ward

17 declares that he suffered injuries that day as he was helping lift a generator from the skiff

18 to the *Ringer II*:

19 The specific procedure established by EHW for us to follow which required
us to lift the generator from the skiff to the Ringer II by hand, rather than
20 using a crane. [Steve] Erickson, the supervisor, on board the Ringer II,
made an attempt to assist while we were in the middle of trying to fling the
21 generator onto the Ringer II. He grabbed onto the generator, lost control of
it, then dropped the generator back onto me. I braced myself, trying not to
22 fall into the water, which was at least 90 feet deep at this point. I tried to

1      push the generator back on the deck of the Ringer II. The jolt of the
   generator falling directly on me created immediate severe pain in my neck
2      radiating down into my left arm. I lost mobility of my left arm and also had
   immediate severe pain in my neck. I tried to continue to work hoping the
3      pain would go away.

4 Ward Dec. at 4. It is undisputed that there was no formal written report of Ward's injury.

5 Two of Ward's coworkers, however, declare that Ward was injured.

6     Johnny Meadows, a coworker, was assisting Ward in lifting the generator from the

7 skiff. *Id*. Mr. Meadows contends that, after the incident, "[Ward] would come to work

8 and just sit in the lunchroom on Ringer II holding his arm and shoulder, in obvious pain."

9 Dkt. 38, Declaration of Johnny Meadows, 3. Mr. Meadows also "helped fill in for

10 [Ward] by carrying work materials that needed to be moved because [Ward] could not lift

11 or carry much weight." *Id*.

12     Hawn Garten, another coworker, was at the wheel of the skiff when the incident

13 occurred. Ward Dec. at 4. Mr. Garten declares that he "witnessed Erickson simply drop

14 the generator back on Perry Ward when he – Erickson – could no longer hold on to it."

15 Dkt. 39, Declaration of Hawn Garten, 2. Mr. Garten also confirms that "[Ward] would

16 come to work and just sit in the lunchroom on Ringer II holding his arm and shoulder, in

17 pain." *Id*. at 3.

18     On the other hand, Mr. Erickson does not recall the incident in question.

19 Specifically, Mr. Erickson declares as follows:

20     I have been made aware that Mr. Ward alleges an injury sustained on
   the job sometime between April 10, 2014 and April 17, 2014. I understand
21     that Mr. Ward alleges my involvement in an incident during that period
   which involves the lifting of a generator. I also understand Mr. Ward
22

> asserts that I caused and/or witnessed an accident to him, which led to an injury to her [sic] neck and shoulder.
>
> I recall being out at the Naval yard project for approximately one week sometime in April 2014, but I cannot confirm I was out at the project on the dates Mr. Ward alleges I was present. I also recall having to lift a generator with Mr. Ward, but I do not recall losing control of the generator or having the generator fall back on Mr. Ward. If a generator had fallen on or near Mr. Ward, I would have reported said incident. At the very least, I would have completed a near-miss report.
>
> I do not recall Mr. Ward informing me that he injured himself during this incident. I do not recall seeing Mr. Ward get injured. I do not recall Mr. Ward asking for me to fill out an incident report. I do not recall Mr. Ward asking me for medical care. I do not recall Mr. Ward asking me to report the incident to a safety supervisor. I do not recall any investigation occurring for this alleged incident. I do not recall any co-employees of Mr. Ward informing me that he injured himself or needed medical care.
>
> ***
>
> I simply do not recall any injury to Mr. Ward while I worked with him for the one week where I was his supervisor. I do not recall any incident reported by Mr. Ward or any pain in the neck or shoulder complained of by Mr. Ward to me during the week where I was his supervisor.
>
> I recall the area that Mr. Ward was standing during the generator lift was about five feet wide.  I recall the generator being about two-and-a-half feet wide.  Had there been an incident where the generator fell back on Mr. Ward, it is likely that Mr. Ward would have either had the generator fall right on top of him, or that he would have been knocked into the water.  If either of these events had occurred, a near-miss report would have had to been [sic] at the very least. I never filled out a near-miss report or an incident report for Mr. Ward. I was never asked to do so by Mr. Ward.

Dkt. 52, Declaration of Steve Erickson, 2–4.

With regard to Ward notifying anyone about his injury, Mr. Erickson, the project superintendent, states that EHW has procedures for reporting work injuries.  Specifically, Mr. Erickson declares that

> The [job] requirements include notification and reporting all injuries, no matter how minor. Employees are also instructed of the necessary processes for reporting an injury and acquiring medical care. This also is the same for near-miss incidents. Furthermore, the time sheets for every employee for

ORDER - 6

1      EHW Constructors provides for a reporting mechanism to indicate whether
       that employee suffered an injury on the day in question.
2
*Id*. It is undisputed that neither Ward nor any other employee completed an injury report
3
or a near-miss report. Moreover, the foreman's daily report for the date in question,
4
which was initialed by Ward, states that Ward was not injured on April 14, 2014. Dkt.
5
50-3 at 12.
6
       Ward declares that, after the incident, he attempted to work through the pain. This
7
lasted until June 2014 when Ward "had to quit working" because he "could no longer
8
stand the pain from [his] injury." Ward Dec. at 2. Contrary to Ward's contention,
9
EHW's position is that Ward was terminated due to "a marked reduction in force and
10
absenteeism." Anderson Dec. at 3. Mr. Eskins, Ward's supervisor at the time, declares
11
as follows:
12
           Around June 2014, Mr. Ward began missing significant amounts of
13     time from work. When I began to question Mr. Ward as to why he was
       missing work, he informed me that he needed to miss time from work in
14     order to take care of a tree farm he had in Idaho. Often, he would call in and
       indicate that he could not make it in to work because he was stuck at the
15     farm. This usually occurred on Mondays, but would occur during the week
       as well. He never indicated he was acquiring medical care or that he
16     suffered an injury at work during any of our phone conversations. No one
       has ever informed me that they received a call from Mr. Ward or about Mr.
17     Ward missing time related to a work injury. All of work absences were
       related to work at his tree farm.
18         In July 2014, I decided that Mr. Ward had missed so much time due
       to his work at his farm that we had to sever the employer/employee
19     relationship with him. Further, we began to run out of productive things
       that were available for piledrivers to do, as there were certain phases of the
20     project that were slowing down. Since Mr. Ward had missed a lot of time
       tending to another business, and we were slowing down; I made the
21     decision to terminate his employment with EHW Constructors.
           I communicated my decision directly to Mr. Ward, who indicated he
22     was fine with the decision, as he needed to be out at his tree farm to

ORDER - 7

concentrate on his logging business. He voluntarily came in on his termination date to sign the termination paperwork. He did not complain about the reasons for termination. At the time of his termination, he did not inform me that he was working with pain. At the time of his tem1ination, he did not request medical care. Both Mr. Ward, himself, and I signed the termination paperwork.

Eskins Dec. at 5–6.

On July 1, 2014, EHW formally terminated Ward. *Id*. Judy Anderson, EHW's field administrator met with Ward in person and processed his termination paperwork. Anderson Dec. at 4. The termination notice states that the reasons for termination were reduction in force and lack of availability for work and is signed by Ward. *Id*., Exh. 2. Anderson recalls that Ward was "going to work on his log business after he left EHW Constructors" and even provided Anderson with a business card, which shows Ward as owner of Ape Log Creations. *Id*., Exh. 3. With regard to Ward's injury, Anderson declares as follows:

Mr. Ward did not mention anything to me about any pain from which he was suffering nor did he mention anything to me about any injury he suffered while working for EHW Constructors. He did not appear in any pain when I met with him. He was actually in a very amiable mood. He did not have any complaints with his reasons for termination. He did not seem to have any issue with leaving EHW Constructors, as he continued to discuss his log business. Had Mr. Ward complained of any need for medical care or any pain he was suffering, I would have sent him to our safety officers.

*Id*. at 4.

On July 8, 2014, Ward sought medical treatment for his work-related injuries with Dr. James M.T. Garrity, D.O. Ward reported "pain radiating into his left upper extremity that is severe . . . ." Dkt. 31, Declaration of James Gooding, Exh. 1. Dr. Garrity assessed

ORDER - 8

a cervical sprain and recommended using Motrin for the pain as well as proceeding with an MRI. *Id*.

In early 2015, Ward contacted the U.S. Department of Labor ("DOL") regarding his injury. On February 3, 2015, the DOL contacted EHW and informed it that Ward had submitted a claim for compensation under the Longshore and Harbor Worker's Compensation Act. Ward Dec., Exh. 3. EHW turned the claim over to its insurance carrier, Zurich. On February 16, 2015, Cynthia Schmidt, Zurich's claim handler, sent a letter to Ward regarding his claim stating that she had unsuccessfully tried to contact him on multiple occasions. *Id*. On February 18, 2015, Ms. Schmidt sent a notice of controversion to the DOL explaining that Zurich "controverts the claim in its' [sic] entirety due to late reporting and due to no medical documentation to support an on-the-job injury." Dkt. 55, Declaration of Cynthia Schmidt, Exh. 1.

### III. DISCUSSION

Ward moves for summary judgment on his claims for maintenance and cure and for dismissal of some of EHW's affirmative defenses. Dkt. 28.

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

Finally, with regard to the burden of proof, "*where the moving party has the burden*—the plaintiff on a claim for relief or the defendant on an affirmative defense—

1  *his showing must be sufficient for the court to hold that no reasonable trier of fact could*
2  *find other than for the moving party.*" *Calderone v. United States*, 799 F.2d 254, 259
3  (6th Cir. 1986) (citation omitted); *see also Southern Calif. Gas Co. v. City of Santa Ana*,
4  336 F.3d 885, 888 (9th Cir. 2003).

**B. Ward's Injury**

In this case, EHW argues that "[t]here are material issues of fact regarding whether [Ward] was ever even injured while working for EHW." Dkt. 49 at 12. Ward counters that EHW has failed to submit actual evidence countering Ward's version of the events. Dkt. 57 at 3–8. But Ward fails to recognize that EHW is not obligated to submit a declaration specifically contesting Ward's version of the events. There is plenty of evidence to raise a reasonable inference that Ward was not hurt. For example, why did Ward say he was not hurt on the time card for that day's work? Why did Ward not tell any other person that he was hurt during the last two months of work or when he was terminated? Combining these reasonable inferences with Ward's heightened burden while moving for summary judgment when he bears the burden shows that he is not entitled to summary judgment. In other words, a reasonable trier of fact could find other than for Ward. Therefore, the Court denies Ward's motion on the issue of whether Ward actually suffered an injury.

**C. Jones Act**

The Jones Act provides a remedy for "any seaman" injured "in the course of his employment." 46 U.S.C. § 688. A plaintiff is a Jones Act seaman only if (1) his duties contribute to the function of the vessel or to the accomplishment of its mission, and (2) he

1  has a connection to a vessel in navigation that is substantial both in duration and in

2  nature.  *See Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289, 1292 (9th Cir. 1997)

3  (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)).  The issue of seaman status

4  under the Jones Act "is a mixed question of law and fact, and it often will be

5  inappropriate to take the question from the jury." *Harbor Tug & Barge Co. v. Papai*, 520

6  U.S. 548, 554 (1997); *see also McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355

7  (1991) ("seaman status under the Jones Act is a question of fact for the jury.").

8        In this case, Ward has failed to show that, as a matter of law, he was a seaman

9  under the Jones Act.  The most persuasive evidence that Ward is a seaman was

10  improperly submitted with Ward's reply.  *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th

11  Cir.1996), *cert. denied* 522 U.S. 808 (1997) (quoting *Black v. TIC Inv. Corp.*, 900 F.2d

12  112, 116 (7th Cir. 1990)) ("Where new evidence is presented in a reply to a motion for

13  summary judgment, the district court should not consider the new evidence without

14  giving the [non]movant an opportunity to respond.").  In his second declaration, Ward

15  declares as follows:

16        I never worked on any land during my employment with EHW and I have always been a marine-based pile driver. I never was physically on the wharf while performing my work. Approximately 90 percent of my time was spent on the Ringer II, a floating spud barge, landing pre-cast pilings in approximately 90 feet of water. To get to shore I either had to take a tug boat or skiff.

      I spent a considerable amount of time in the skiff directing piles into the water from the skiff. I was also required to work around the edge, often banging off the edge, of the barge. The risk of falling into approximately 90 feet of open, navigable water was always a risk while performing my pile driver duties.

      While on the Ringer II we floated on anchors or spuds and had to reposition the barge almost daily. This was done generally by pulling

> anchors or being pushed by tug boats. I was on the barge when this repositioning occurred. I also assisted in setting and retrieving anchors on the barge which was a dangerous job.

Dkt. 58, Second Declaration of Perry A. Ward, ¶¶ 2–4. Although this evidence tends to show that Ward was a seaman, the Court may not properly consider it unless EHW is afforded an opportunity to respond. Therefore, the Court reserves ruling on this issue and will set a briefing schedule.

**D.    Affirmative Defenses**

Ward moves for summary judgment on thirteen of EHW's affirmative defenses. Dkt. 28 at 19–24. Some of Ward's arguments have merit. For example, EHW's affirmative defenses of improper venue and failure to perfect service have most likely been waived at this point. Fed. R. Civ. P. 12(h)(1). Moreover, EHW failed to respond to Ward's arguments as to EHW's first, second, fourth, and seventeenth affirmative defenses. Upon review of the record and the pleadings, the Court concludes that Ward is entitled to summary judgment on these defenses and grants Ward's motion on these issues.

With regard to the remainder of Ward's arguments, the Court concludes that Ward has failed to show that he is entitled to judgment as a matter of law and that no questions of material fact exist. Therefore, the Court denies the remainder of Ward's motion on EHW's affirmative defenses.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Ward's motion for summary judgment (Dkt. 28) is **GRANTED in part**, **DENIED in part**, and **RESERVED in part** as stated

herein. EHW may file a response to Ward's additional evidence no longer than 12 pages no later than April 29, 2016. Ward may file a reply no longer than 12 pages no later than May 6, 2016. The Clerk shall renote the motion for consideration on the Court's May 6, 2016 calendar.

Dated this 20th day of April, 2016.

BENJAMIN H. SETTLE
United States District Judge