UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PERRY A. WARD,

                        Plaintiff,

v.

EHW CONSTRUCTORS, et al.,

                        Defendants.

CASE NO. C15-5338 BHS

ORDER DENYING IN PART
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Perry Ward's ("Ward") motion for summary judgment (Dkt. 28), the Court's order granting the motion in part, denying it in part, and reserving ruling in part (Dkt. 61), and the parties' additional briefing. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby rules as follows:

## I. PROCEDURAL HISTORY

On May 21, 2015, Ward filed a complaint against Defendants EHW Constructors, American Bridge Company, J.V., Nova Group, Inc., and Skanska USA Civil Southeast, Inc. (collectively "EHW") in rem and in personam for personal injury. Dkt. 1. On June 22, 2015, Ward filed an amended complaint alleging that EHW has failed to pay mandatory maritime benefits. Dkt. 12.

On January 14, 2016, Ward filed a motion for summary judgment. Dkt. 28. On April 20, 2016, the Court granted the motion in part, denied it in part, reserved ruling in part, and requested additional briefing. Dkt. 61. On April 29, 2016, EHW responded and submitted additional evidence. Dkt. 62. On May 9, 2016, Ward replied. Dkt. 66.

## II. FACTUAL BACKGROUND

The remaining issue is whether Ward is a seaman under the Jones Act. The following facts are relevant to this issue:

In May 2012, the U.S. Department of Defense awarded EHW the contract to build an explosives handling wharf at Naval Base Kitsap-Bangor. The contract called for EHW to construct a number of structures, including a covered slip long enough for a 560-foot-long submarine, a warping wharf, trestle roads, power utility booms, hardened guard gun positions, and a waterfront support. Dkt. 50, Declaration of William Eskins ("Eskins Dec."), 2.

The wharf project utilized a number of pieces of equipment. Among these were several floating structures, including the *Ringer II*, which was an un-crewed floating platform comprised of interlocking flexi-floats. The flexi-floats are a combination of portable, interlocking modular barges and ancillary attachments, designed for use in inland marine, heavy-construction applications, which, when connected, could reach several hundred feet in length. The group of flexi-floats comprising the *Ringer II* was held in place with anchors or "spuds" then maneuvered at the worksite either by tug or by deck wenches. In addition to the flexi-floats, support skiffs were also used on the project to transport materials and laborers. These skiffs are flat-decked boats, approximately

ORDER - 2

1  four feet wide and twelve feet in length with asmall, 90-horsepower motors. The skiffs

2  were not used to move or reposition the flexi-float barges.  *Id*. at 2–3.

3         On January 14, 2014, EHW hired Ward through Ward's local union for pile

4  drivers.  Ward declares that he has been a pile driver for 36 years.  Dkt. 30, Declaration

5  of Perry Ward, 2.  The parties dispute the type of work Ward performed and whether he

6  qualifies as a seaman.  Ward contends that his "work was always completely out on the

7  water, working on vessels doing the pile driving on piles out in the open, navigable

8  waters." *Id*. at 3.  Ward further declares as follows:

9         All of the above [work] activities were . . . on vessels on the open
10 waterway of Hood Canal, unattached to land, and in navigation for uses and
   purposes directly related to working on water. I was attached to/assigned to,
11 on a continual basis, these vessels as for purposes of at-sea work and I
   never worked on land nor was I assigned to work on land. The vessel
12 Ringer II was always at least 300 to 500 yards from shore, and the skiff
   would work in and around where the Ringer II was. None of my crew were
13 ever even arguably considered to be longshore or State Workers
   Compensation participants and EHW never suggested or did anything other
14 than treat us as if we were crew members working together on vessels to
   accomplish the mission and function of those vessels. I have never received
15 any benefits from any Longshore or State program and have never been
   processed under any of those programs.

16 *Id*. at 4–5. In his second declaration, Ward declares as follows:

17        I never worked on any land during my employment with EHW and I
   have always been a marine-based pile driver. I never was physically on the
18 wharf while performing my work. Approximately 90 percent of my time
   was spent on the Ringer II, a floating spud barge, landing pre-cast pilings in
19 approximately 90 feet of water. To get to shore I either had to take a tug
   boat or skiff.
20        I spent a considerable amount of time in the skiff directing piles into
   the water from the skiff. I was also required to work around the edge, often
21 banging off the edge, of the barge. The risk of falling into approximately 90
   feet of open, navigable water was always a risk while performing my pile
22 driver duties.

1    While on the Ringer II we floated on anchors or spuds and had to
     reposition the barge almost daily. This was done generally by pulling
2    anchors or being pushed by tug boats. I was on the barge when this
     repositioning occurred. I also assisted in setting and retrieving anchors on
3    the barge which was a dangerous job.

4    Dkt. 58, Second Declaration of Perry A. Ward, ¶¶ 2–4.

5          On the other hand, EHW contends that Ward was part of a construction crew

6    instead of a seaman.  Steve Erickson, EHW's pile driving foreman, declares as follows:

7    Two different types of crews worked on the project at Naval Base
     Kitsap-Bangor. One type of crew manned the vessels. This would include
8    the vessel captains and deckhands. The other type of crew was a
     construction crew. The construction crews included crane operators,
9    piledrivers, carpenters, and other laborers. The construction crews were
     responsible for the actual construction of the wharf. The wharf was an
10   extension of land and while the construction crew utilized the crane barges
     and skiffs to complete their tasks, they were not assigned to operate or
11   maintain the vessels.
          In my role as Piledriver Foreman, I had the opportunity to work with
12   Mr. Perry Ward. Both Mr. Ward and I were a part of the construction crew.
     All work performed by the crew on which I worked, including the work
13   performed by Mr. Ward, was for the construction of the wharf.

14   Dkt. 52, Declaration of Steve Erickson, 2.  Mr. Eskins declares as follows:

15   All work performed by the crew on which Mr. Ward worked was for
     the construction of the wharf. Mr. Ward did not serve on the tug crews that
16   were used to reposition the RINGER II or other equipment. Mr. Ward's
     time on barges and skiffs was spent performing work constructing the
17   Naval wharf.
          To my recollection, Mr. Ward, as a piledriver, would spend
18   approximately 80% of his time performing precast and setting work on the
     pilings for the wharf. This consisted of cutting off piles, using torches on
19   the piles, and setting pile plugs. He also worked on setting pre-casts for the
     pilings on concrete. Mr. Ward spent 10 hours a day working for EHW
20   Constructors. Of that time, approximately 15-30 minutes would be spent on
     Job Safety analysis meetings on the crane barges, 30 minutes would be
21   spent for lunch on the barges, and 30 minutes would be spent on the barges
     for breaks. Mr. Ward would spend approximately another 30 minutes to an
22   hour on the barges gathering materials for his precasting or performing

1   preparation work on the pilings. All other times were spent on wharf
2   construction, and he would utilize floating platforms or a work skiff as a
    work platform to perform his tasks. Mr. Ward was not hired, or responsible,
3   for piloting or maintaining the barges and tugs used by EHW Constructors
    on the project. On a rare occasion, he would guide crane operators on the
4   use of winches to manipulate the crane barges. During those occasions, the
    barges were anchored.

5   Eskins Dec. at 3–4.

6                                   **III. DISCUSSION**

7   **A.     Summary Judgment Standard**

8          Summary judgment is proper only if the pleadings, the discovery and disclosure

9   materials on file, and any affidavits show that there is no genuine issue as to any material

10  fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

11  The moving party is entitled to judgment as a matter of law when the nonmoving party

12  fails to make a sufficient showing on an essential element of a claim in the case on which

13  the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

14  323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

15  could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

16  *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

17  present specific, significant probative evidence, not simply "some metaphysical doubt").

18  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

19  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

20  jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477

21  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

22  626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

Finally, with regard to the burden of proof, "*where the moving party has the burden*—the plaintiff on a claim for relief or the defendant on an affirmative defense—*his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party*." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted); *see also Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

**B.    Jones Act**

The Jones Act provides a remedy for "any seaman" injured "in the course of his employment." 46 U.S.C. § 688. A plaintiff is a Jones Act seaman only if (1) his duties contribute to the function of the vessel or to the accomplishment of its mission, and (2) he has a connection to a vessel in navigation that is substantial both in duration and in

1 nature.  *See Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289, 1292 (9th Cir. 1997)

2 (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)).  The issue of seaman status

3 under the Jones Act "is a mixed question of law and fact, and it often will be

4 inappropriate to take the question from the jury."  *Harbor Tug & Barge Co. v. Papai*, 520

5 U.S. 548, 554 (1997).

6      In cases involving construction barges, the Ninth Circuit has repeatedly held that

7 workers on such barges meet the first element of the relevant test.  For example, in

8 *Delange v. Dutra Const. Co.*, 183 F.3d 916, 920 (9th Cir. 1999), the Ninth Circuit

9 concluded that the plaintiff served directly in the service of a ship when he "served in

10 various deckhand capacities while the barge was being moved and also assisted in the

11 piledriving carried out from the barge."  The court concluded that a "jury could

12 reasonably conclude from this evidence that Delange contributed to the barge's mission."

13 *Id*.  Similarly, in *Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289, 1292 (9th Cir.

14 1997), the Ninth Circuit concluded that "Cabral's duties as a crane operator

15 unquestionably contribute to Barge 538's function as a crane barge."

16      In this case, Ward has shown that his duties contributed to the function and

17 mission of the *Ringer II* and its support skiffs.  It is undisputed that the majority of

18 Ward's work consisted of construction or setting piles aboard the vessel or a support

19 skiff.  Although EHW classifies this work as "constructing the [land based] wharf" (Dkt.

20 62 at 4), this assertion ignores the reality that piles must be driven into open water before

21 the wharf becomes an extension of land above the water.  Moreover, EHW contends that

22 "there is no evidence that [Ward] performed any crew-type work such as piloting,

ORDER - 7

1    operating, or maintaining a vessel." *Id.*  The Jones Act, however, is not this restrictive

2    and courts have repeatedly extended this element of Jones Act coverage to construction

3    workers on vessels.  *Delange*, 183 F.3d at 920; *Cabral*, 128 F.3d at 1292.  Even if Ward

4    was required to participate in the movement of the vessel, evidence submitted by EHW

5    shows that Ward spent at least some time helping with repositioning anchors.  *See*, *e.g.*,

6    Dkt. 63-1 at 5 (Ward credited three hours working on anchors).  Therefore, the Court

7    concludes that there are no questions of material fact on this issue, no reasonable juror

8    could find other than for Ward on this issue, and Ward is entitled to judgment as a matter

9    of law.

10          Next, the parties dispute whether Ward's connection to the *Ringer II* was

11   substantial in both nature and duration.

12               For the substantial connection requirement to serve its purpose, the
             inquiry into the nature of the employee's connection to the vessel must
13           concentrate on whether the employee's duties take him to sea. This will
             give substance to the inquiry both as to the duration and nature of the
14           employee's connection to the vessel and be helpful in distinguishing land-
             based from sea-based employees.
15
     *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 555 (1997).   "[T]he purpose of the
16
     substantial connection test is to separate land-based workers who do not face the perils of
17
     the sea from sea-based workers whose duties necessarily require them to face those
18
     risks."  *Cabral*, 128 F.3d at 1293.
19
            In *Gipson v. Kajima Eng'g & Const., Inc.*, 972 F. Supp. 537 (C.D. Cal. 1997),
20
     *aff'd*, 173 F.3d 860 (9th Cir. 1999), the court addressed a factual scenario very similar to
21
     the current circumstances.  The defendant hired the plaintiff through the local pile
22

1    driver's union to assist with reconstruction of a bridge.  *Id*. at 539.  The plaintiff's "duties

2    were those of a general pile driver and required him to perform a variety of tasks on land,

3    on the bridge, on the cofferdam whale frames, on floating work platforms, and in the

4    skiff, as the exigencies of a given project demanded." *Id*.  The court concluded that the

5    plaintiff did not work on a vessel in navigation and did not have a substantial connection

6    to the barge in question. *Id*. at 542-45.  The Ninth Circuit upheld that latter conclusion

7    stating that the plaintiff's "association with the barge and the skiff was limited to a single

8    bridge construction project; he presented no evidence he had worked on the barge or skiff

9    before that project, or would continue to work on either vessel after the project was

10   completed." *Gipson v. Kajima Eng'g & Const., Inc.*, 173 F.3d 860 (9th Cir. 1999).

11          Additionally, in *Scheuring v. Traylor Bros.*, 476 F.3d 781 (9th Cir. 2007), the

12   court concluded that questions of fact existed to preclude summary judgment for the

13   employer on the employee's Jones Act claim.  The employee was a crane operator on a

14   huge barge on a mission to build a docking structure for cruise ships. *Id*. at 783.  The

15   employee would ride a skiff to and from the barge every day and, on at least three

16   occasions, was on the barge while it was moved by tugboats. *Id*. at 783–84.  Moreover,

17   the barge was "subject to sea swells, wind waves, vessel wakes and tidal currents." *Id*.

18   at 787.  The court held that this evidence "would allow a jury to find a substantial

19   connection to the vessel both in terms of duration and nature." *Id*.

20          Given the similarity of *Gipson* and *Scheuring* to this case, the Court is unable to

21   conclude that reasonable jurors could find other than for Ward.  For example, Ward's

22   association with the *Ringer II* and the associated skiff were only for the wharf project.

1    Even then, Ward's participation was not even for the duration of the project.  Ward was

2    also exposed to the hazards of sea swells, wakes, and currents, but this evidence does not

3    show that he was a seaman as a matter of law.  A reasonable juror could find this

4    connection was not substantial in nature or duration.  While Ward has cited some out-of-

5    circuit cases for the proposition that the law has become more inclusive of marine-based

6    workers (Dkt. 66 at 5–9), the cases at most support the conclusion that it is often

7    inappropriate to take this question from the jury.  *Papai*, 520 U.S. at 554 (1997).

8    Therefore, the Court denies Ward's motion on this issue.

9                                                **IV. ORDER**

10            Therefore, it is hereby **ORDERED** that Ward's motion for summary judgment

11   (Dkt. 28) is **DENIED in part**.

12            Dated this 25th day of May, 2016.

13

14   _____

15   BENJAMIN H. SETTLE
     United States District Judge

16

17

18

19

20

21

22

ORDER - 10