UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PERRY A. WARD,

                  Plaintiff,

v.

EHW CONSTRUCTORS, et al.,

                  Defendants.

CASE NO. C15-5338 BHS

ORDER GRANTING
DEFENDANTS' MOTION FOR
PARTIAL SUMMARY
JUDGMENT AND GRANTING IN
PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY
JUDGMENT

This matter comes before the Court on the summary judgment motions of Plaintiff Perry Ward ("Plaintiff") and Defendants EHW Constructors, American Bridge Company, J.V., Nova Group, Inc., and Skanska USA Civil Southeast, Inc. ("Defendants"). Dkts. 108, 109. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby (1) grants Defendants' motion for partial summary judgment and (2) grants in part and denies in part Plaintiff's motion for partial summary judgment.

## I. PROCEDURAL HISTORY

On May 21, 2015, Plaintiff filed a complaint against Defendants *in rem* and *in personam* for personal injury. Dkt. 1. On June 22, 2015, Plaintiff filed an amended

complaint alleging that Defendants have failed to pay mandatory maritime benefits. Dkt. 12.

On January 14, 2016, Plaintiff filed a motion for summary judgment. Dkt. 28. On April 20, 2016, the Court granted the motion in part, denied it in part, reserved ruling in part, and requested additional briefing on the issue of Plaintiff's seaman status. Dkt. 61. On May 25, 2016, the Court denied summary judgment on the issue of Plaintiff's seaman status, finding that questions of fact remained on whether Plaintiff had a connection to a vessel in navigation that was substantial in both nature and duration. Dkt. 67.

On November 3, 2016, Defendants filed their motion for partial summary judgment on the issue of punitive damages. Dkt. 108. On November 4, 2016, Plaintiff filed a motion for partial summary judgment on the issue of his seaman status and various affirmative defenses. Dkt. 109.

On November 21, 2016, Plaintiff's responded to Defendants' motion. Dkt. 111. November 25, 2016, Defendants replied. Dkt. 116. On November 28, 2016, Defendants responded to Plaintiff's motion. Dkt. 118. On December 2, 2016, Plaintiff replied. Dkt. 124.

## II. FACTUAL BACKGROUND

In May 2012, the U.S. Department of Defense awarded Defendants the contract to build an explosives-handling wharf at Naval Base Kitsap-Bangor. The contract called for Defendants to construct a number of structures, including a covered slip long enough for a 560-foot-long submarine, a warping wharf, trestle roads, power utility booms, hardened guard gun positions, and a waterfront support. Dkt. 50.

1    The wharf project utilized a number of pieces of equipment. Among these were

2    several floating structures, including the *Ringer II*, which was an un-crewed floating

3    platform comprised of interlocking flexi-floats. The flexi-floats are a combination of

4    portable, interlocking modular barges and ancillary attachments, designed for use in

5    inland marine, heavy-construction applications, which, when connected, could reach

6    several hundred feet in length. The group of flexi-floats comprising the *Ringer II* was

7    held in place with anchors or "spuds" then maneuvered at the worksite either by tug or by

8    deck wenches. In addition to the flexi-floats, support skiffs were also used on the project

9    to transport materials and laborers. These skiffs are flat-decked boats, approximately four

10   feet wide and twelve feet in length with small, 90-horsepower motors. The skiffs were

11   not used to move or reposition the flexi-float barges. *Id*. at 2–3.

12       On January 14, 2014, Defendants hired Plaintiff through Plaintiff's local union for

13   pile drivers. Plaintiff declares that he has been a pile driver for 36 years. Dkt. 30. The

14   parties dispute the type of work Plaintiff performed and whether he qualifies as a seaman.

15   Plaintiff contends that his "work was always completely out on the water, working on

16   vessels doing the pile driving on piles out in the open, navigable waters." *Id*. at 3.

17   Plaintiff further declares as follows:

18       All of the above [work] activities were . . . on vessels on the open
         waterway of Hood Canal, unattached to land, and in navigation for uses and
19       purposes directly related to working on water. I was attached to/assigned to,
         on a continual basis, these vessels as for purposes of at-sea work and I
20       never worked on land nor was I assigned to work on land. The vessel
         Ringer II was always at least 300 to 500 yards from shore, and the skiff
21       would work in and around where the Ringer II was. None of my crew were
         ever even arguably considered to be longshore or State Workers
22       Compensation participants and EHW never suggested or did anything other

1  than treat us as if we were crew members working together on vessels to
   accomplish the mission and function of those vessels. I have never received

2  any benefits from any Longshore or State program and have never been
   processed under any of those programs.

3
   *Id*. at 4–5.

4
       Defendants contend that Plaintiff was part of a construction crew instead of a

5
   seaman. Steve Erickson, Defendants' pile driving foreman, has declared as follows:

6
       Two different types of crews worked on the project at Naval Base

7      Kitsap-Bangor. One type of crew manned the vessels. This would include
       the vessel captains and deckhands. The other type of crew was a

8      construction crew. The construction crews included crane operators,
       piledrivers, carpenters, and other laborers. The construction crews were

9      responsible for the actual construction of the wharf. The wharf was an
       extension of land and while the construction crew utilized the crane barges

10     and skiffs to complete their tasks, they were not assigned to operate or
       maintain the vessels.

11         In my role as Piledriver Foreman, I had the opportunity to work with
       Mr. Perry Ward. Both Mr. Ward and I were a part of the construction crew.

12     All work performed by the crew on which I worked, including the work
       performed by Mr. Ward, was for the construction of the wharf.

13
   Dkt. 52. Mr. Eskins has declared as follows:

14
       All work performed by the crew on which Mr. Ward worked was for

15     the construction of the wharf. Mr. Ward did not serve on the tug crews that
       were used to reposition the RINGER II or other equipment. Mr. Ward's

16     time on barges and skiffs was spent performing work constructing the
       Naval wharf.

17         To my recollection, Mr. Ward, as a piledriver, would spend
       approximately 80% of his time performing precast and setting work on the

18     pilings for the wharf. This consisted of cutting off piles, using torches on
       the piles, and setting pile plugs. He also worked on setting pre-casts for the

19     pilings on concrete. Mr. Ward spent 10 hours a day working for EHW
       Constructors. Of that time, approximately 15-30 minutes would be spent on

20     Job Safety analysis meetings on the crane barges, 30 minutes would be
       spent for lunch on the barges, and 30 minutes would be spent on the barges

21     for breaks. Mr. Ward would spend approximately another 30 minutes to an
       hour on the barges gathering materials for his precasting or performing

22     preparation work on the pilings. All other times were spent on wharf

construction, and he would utilize floating platforms or a work skiff as a
work platform to perform his tasks. Mr. Ward was not hired, or responsible,
for piloting or maintaining the barges and tugs used by EHW Constructors
on the project. On a rare occasion, he would guide crane operators on the
use of winches to manipulate the crane barges. During those occasions, the
barges were anchored.

Dkt. 50 at 3–4.

Plaintiff's duties are further clarified in the depositions of Mr. Eskins and Mr.

Erickson. These depositions clarify that a pile buck like Plaintiff would participate in the

maintenance and operation of a skiff. Dkt. 110-6 at 7. Also, Plaintiff's job as a pile buck

consisted in large part of work performed "out of a boat or float" or operating and

moving about on a skiff. Dkt. 110-3 at 6, 13; Dkt. 110-6 at 9–12.

It is undisputed that neither Plaintiff nor any other employee completed an injury

report or a near-miss report. Moreover, the foreman's daily report for the date in

question, which was initialed by Plaintiff, states that Plaintiff was not injured on April 14,

2014. Dkt. 50-3 at 12.

Plaintiff has declared that, after the incident, he attempted to work through the

pain. This lasted until June 2014 when Plaintiff "had to quit working" because he "could

no longer stand the pain from [his] injury." Dkt. 30 at 2. Contrary to Ward's contention,

Defendants' position is that Ward was terminated due to "a marked reduction in force and

absenteeism." Dkt. 53 at 3.

On July 1, 2014, Defendants formally terminated Plaintiff. *Id*. Judy Anderson,

Defendants' field administrator met with Plaintiff in person and processed his termination

paperwork. Dkt. 53 at 4. The termination notice states that the reasons for termination

1   were reduction in force and lack of availability for work and was signed by Plaintiff. Dkt.

2   53-2. Anderson recalls that Plaintiff was "going to work on his log business after he left

3   EHW Constructors" and even provided Anderson with a business card, which shows

4   Plaintiff as owner of Ape Log Creations. Dkt. 53-3. With regard to Plaintiff's injury,

5   Anderson declares as follows:

6           Mr. Ward did not mention anything to me about any pain from
        which he was suffering nor did he mention anything to me about any injury
7       he suffered while working for EHW Constructors. He did not appear in any
        pain when I met with him. He was actually in a very amiable mood. He did
8       not have any complaints with his reasons for termination. He did not seem
        to have any issue with leaving EHW Constructors, as he continued to
9       discuss his log business. Had Mr. Ward complained of any need for
        medical care or any pain he was suffering, I would have sent him to our
10      safety officers.

11  Dkt. 53 at 4.

12          On July 8, 2014, Plaintiff sought medical treatment for his work-related injuries

13  with Dr. James M.T. Garrity, D.O. Plaintiff reported "pain radiating into his left upper

14  extremity that is severe . . . ." Dkt. 31-1. Dr. Garrity assessed a cervical sprain and

15  recommended using Motrin for the pain as well as proceeding with an MRI. *Id.*

16          In early 2015, Plaintiff contacted the U.S. Department of Labor ("DOL")

17  regarding his injury. On February 3, 2015, the DOL contacted Defendants and informed

18  them that Plaintiff had submitted a claim for compensation under the Longshore and

19  Harbor Worker's Compensation Act. Dkt. 30- 3. Defendants turned the claim over to

20  their insurance carrier, Zurich. On February 16, 2015, Cynthia Schmidt, Zurich's claim

21  handler, sent a letter to Plaintiff regarding his claim stating that she had unsuccessfully

22  tried to contact him on multiple occasions. *Id.* On February 18, 2015, Ms. Schmidt sent a

1  notice of controversion to the DOL explaining that Zurich "controverts the claim in its'

2  [sic] entirety due to late reporting and due to no medical documentation to support an on-

3  the-job injury." Dkt. 55-1.

4      It appears that the first time Plaintiff raised his claim for maintenance and cure as

5  a seaman occurred when he filed his complaint in this action on May 21, 2015, although

6  there is no sworn testimony to this fact. *See* Dkt. 108 at 4. On January 27, 2016,

7  Defendants instituted voluntary payments to Plaintiff for maintenance and cure, including

8  back pay for maintenance to the date of Plaintiff's alleged injury. Dkt. 41 at 2.

9                           **III. DISCUSSION**

10     Defendants move for partial summary judgment on the issue of punitive damages.

11  Dkt. 108. Plaintiff moves for summary judgment on the issue of his status as a seaman

12  and some of Defendants' affirmative defenses. Dkt. 109.

13  **A.    Summary Judgment Standard**

14     Summary judgment is proper only if the pleadings, the discovery and disclosure

15  materials on file, and any affidavits show that there is no genuine dispute as to any

16  material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ.

17  P. 56(c). The moving party is entitled to judgment as a matter of law when the

18  nonmoving party fails to make a sufficient showing on an essential element of a claim in

19  the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*,

20  477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record,

21  taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.

22  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving

1  party must present specific, significant probative evidence, not simply "some

2  metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over

3  a material fact exists if there is sufficient evidence supporting the claimed factual dispute,

4  requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

5  *Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

6  *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

7      The determination of the existence of a material fact is often a close question. The

8  Court must consider the substantive evidentiary burden that the nonmoving party must

9  meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

10 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

11 issues of controversy in favor of the nonmoving party only when the facts specifically

12 attested by that party contradict facts specifically attested by the moving party. The

13 nonmoving party may not merely state that it will discredit the moving party's evidence

14 at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

15 *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

16 nonspecific statements in affidavits are not sufficient, and missing facts will not be

17 presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

18      Finally, with regard to the burden of proof, "*where the moving party has the*

19 *burden*—the plaintiff on a claim for relief or the defendant on an affirmative defense—

20 *his showing must be sufficient for the court to hold that no reasonable trier of fact could*

21 *find other than for the moving party*." *Calderone v. United States*, 799 F.2d 254, 259 (6th

22

1    Cir. 1986) (citation omitted); *see also Southern Calif. Gas Co. v. City of Santa Ana*, 336

2    F.3d 885, 888 (9th Cir. 2003).

3    **B.    Defendants' Motion for Summary Judgment on Punitive Damages**

4         Defendants move for summary judgment on punitive damages, arguing that

5    Plaintiff cannot show that they engaged in a willful or wanton failure to satisfy

6    obligations of maintenance and cure.

7         When a seaman is injured in the service of a vessel, the employer must pay

8    maintenance and cure even where the employer is not at fault. *Barnes v. Sea Hawaii*

9    *Rafting, LLC*, 983 F. Supp. 2d 1208, 1212 (D. Haw. 2013). An injured seaman may seek

10   punitive damages against an employer "for the willful and wanton disregard of the

11   maintenance and cure obligation." *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404,

12   424, 129 S. Ct. 2561, 2575, 174 L. Ed. 2d 382 (2009). "[A]n employer is entitled to

13   investigate a claim for maintenance and cure before tendering any payments to the

14   seaman—without subjecting itself to liability for compensatory or punitive damages."

15   *Boudreaux v. Transocean Deepwater, Inc.*, 721 F.3d 723, 728 (5th Cir. 2013) (citing

16   *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987)). But "[l]axness in

17   investigating a claim that would have been found to be meritorious will subject a

18   shipowner to liability for attorney's fees and punitive damages." *Rose v. Miss Pac., LLC*,

19   3:09-CV-00306-ST, 2012 WL 75028, at *8 (D. Or. Jan. 10, 2012) (quoting *Breese v.*

20   *AWI, Inc.*, 823 F.2d 100, 104 (5th Cir.1987)).

21        Plaintiff first claimed that he was entitled to maintenance and cure when he filed

22   his complaint. Defendants initially refused to pay maintenance and cure. To the extent

1   that Defendants contend they acted reasonably in delaying payment to investigate

2   Plaintiffs claim, Plaintiff has presented sufficient evidence to suggest that Defendants

3   were excessively "lax" in their efforts to investigate his alleged injury. Specifically, he

4   indicates that he made multiple attempts to communicate with Defendants regarding his

5   claim, including sending them medical information from his doctor, and that they were

6   unresponsive. Therefore, if the legitimacy of Plaintiff's injury was the only ground on

7   which Defendants opposed maintenance and cure payments, the availability of punitive

8   damages would properly be reserved for the finder of fact.

9       However, Defendants also oppose maintenance and cure payments on a theory that

10  Plaintiff is not a seaman. "Refusal to pay maintenance and cure cannot be willful and

11  wanton if it is based on a reasonable defense such as the seaman's concealment of his

12  medical condition." *Rose*, 2012 WL 75028 at *9 (citing *Brown v. Parker Drilling*

13  *Offshore Corp.*, 410 F.3d 166, 178 (5th Cir. 2005). Indeed, "the willful, wanton and

14  callous conduct required to ground an award of punitive damages requires an element of

15  bad faith." *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 90 (5th Cir. 1984).

16      In all the cases cited by the parties, and those reviewed in the Court's own

17  research, the Court is unable to find any analysis on whether punitive damages are

18  available when an employer opposes maintenance and cure on the grounds that the

19  employee is not a seaman. It appears that the Court is therefore facing an issue of first

20  impression. To resolve this issue, in light of the above-cited authority, the Court will

21  consider whether a rational juror could conclude that Defendants have acted in "bad

22  faith" by contending that Plaintiff is not a seaman.

1    The Court has previously denied a motion for summary judgment by Plaintiff on

2    the issue of his alleged seaman status. *See* Dkt. 67 at 8–10. As explained below, the Court

3    does so again today. Based on the evidence presented by the parties, whether Defendant's

4    duties qualified him as a seaman substantially connected to *Ringer II* is an issue upon

5    which reasonable minds could differ, thereby rendering Plaintiff's seaman status an issue

6    for the jury. *Delange v. Dutra Const. Co., Inc.*, 183 F.3d 916, 920 (9th Cir. 1999) ("[I]f

7    reasonable persons, applying the proper legal standard, could differ as to whether the

8    employee was a 'member of the crew,' it is a question for the jury.") (quoting *McDermott*

9    *Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)). Because reasonable minds could differ

10   on whether Plaintiff's duties rendered him a seaman, no rational juror could find that

11   Defendants' opposition to maintenance and cure was in bad faith. Therefore, the Court

12   grants Defendants' motion for summary judgment and finds that punitive damages are

13   unavailable for Defendants' allegedly wrongful refusal to pay maintenance and cure.

14   **C.    Plaintiff's Motion for Summary Judgment**

15        **1.    Seaman Status**

16        To the extent Defendants oppose maintenance and cure on the theory that Plaintiff

17   is not a seaman, the only question remaining is whether Plaintiff's connection to the

18   *Ringer II* was substantial in both nature and duration. *See* Dkt. 67 at 8–10.

19        "[T]he purpose of the substantial connection test is to separate land-based workers

20   who do not face the perils of the sea from sea-based workers whose duties necessarily

21   require them to face those risks." *Cabral v. Healy Tibbits Builders, Inc.*, 128 F.3d 1289,

22   1293 (9th Cir. 1997). To satisfy this test, "[i]t is not necessary that a seaman aid in

navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work." *Wilander*, 498 U.S. at 355. "[T]he court should focus on whether the employee's duties are 'primarily sea-based activities' in determining whether the nature of the connection to the vessel is substantial." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 786 (9th Cir. 2007). The Supreme Court has considered the substantial connection test in a more general sense, asking whether employees "owe their allegiance to a vessel and not solely to a land-based employer." *Wilander*, 498 U.S. at 347. "[I]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of the crew,' it is a question for the jury." *Delange*, 183 F.3d at 920 (quotation omitted).

In the order on Plaintiff's previous motion for summary judgment, the Court concluded that "[g]iven the similarity of *Gipson* and *Scheuring* to this case, the Court is unable to conclude that reasonable jurors could not find other than for Ward." Dkt. 67 at 9. In reaching this conclusion, the Court cited (1) Plaintiff's limited association with the *Ringer II* and skiffs for the purposes of the wharf project and (2) the fact that Plaintiff's participation was not for the entire duration of the project. *Id.* at 9–10.

The developed record has certainly provided Plaintiff with a more persuasive case, and his case can be distinguished from both *Gipson v. Kajima Eng'g & Const., Inc.*, 972 F. Supp. 537, 542 (C.D. Cal. 1997), *aff'd*, 173 F.3d 860 (9th Cir. 1999), and *Scheuring*, 476 F.3d 781. Plaintiff has provided evidence to show that a pile buck like himself, at least to some extent, would participate in the maintenance of a skiff. Dkt. 110-6 at 7. Plaintiff's job as a pile buck consisted in large part of work performed "out of a boat or

1   float" or operating a skiff. Dkt. 110-3 at 6, 13; Dkt. 110-6 at 9–12. On the other hand, the

2   issue remains that Plaintiff's work also consisted largely of marine construction tasks

3   (such as cutting piles, setting precast pile caps, and maintaining a crane) carried out from

4   staging built around the pilings or from a barge that moved only slightly by anchor or,

5   when larger movements were necessary, with the help of tugboats. Dkt. 110-3 at 5–7, 9.

6          Plaintiff also argues that the limited duration of his work involving the *Ringer II*

7   should not factor into his status as a seaman, analogizing his position to that of a

8   temporary summertime Alaskan fisherman who is undoubtedly a seaman. *See* Dkt. 109 at

9   16. However, it is a long settled principle that fishermen are seamen. *The Virginia Belle*,

10  204 F. 692, 693 (E.D. Va. 1913) ("[T]he maritime law treats persons engaged in fishing

11  enterprises upon waters as seamen, and accords them the same rights, privileges, and

12  remedies afforded seamen."); *The Carrier Dove*, 97 F. 111, 112 (1st Cir. 1899)

13  ("Fishermen are seamen, having uses and customs peculiar to their business, but are at

14  the same time, except as modified by their peculiar contracts, express or implied,

15  protected by law as other seamen are."). In a case involving a boat fisherman, there

16  would be no doubt that "the employee's duties are 'primarily sea-based activities.'"

17  *Scheuring*, 476 F.3d at 786. Plaintiff's job, however, consisted of many general marine

18  construction work tasks, and while his position involved the frequent use of a barge,

19  floating platforms, and a skiff in this instance, his work as a pile driver is not a well-

20  established "sea-based activity." *See, e.g.*, *Gipson*, 972 F. Supp. 537 (pile driver not a

21  seaman when he lacks "more or less permanent connection" with a particular skiff or

22  barge); *Gault v. Modern Cont'l/Roadway Constr. Co., Inc., Joint Venture*, 100 Cal. App.

4th 991, 1003 (2002) (pile driver's connection to barge as a vessel in navigation is a question of fact).

Accordingly, the Court finds that issues remain on the quantity of Plaintiff's work performed from the staging, the skiffs, or the barge, and what tasks should be considered "sea-based activity." While the Court might be inclined to find that Plaintiff's activities consisted of many sea-based activities, a question remains as to whether Plaintiff's "duties are '*primarily* sea-based activities.'" *Scheuring*, 476 F.3d at 786 (emphasis added). Moreover, to the extent the Court previously analogized *Gipson* to the present case, issues of fact remain on whether the *Ringer II* or the floating platforms from which plaintiff worked, although it is clear that they would move to some extent, should be considered vessels *in navigation*. Accordingly, the Court denies summary judgment on the issue of Plaintiff's seaman status, as reasonable minds could differ on whether he has a connection to a vessel in navigation that is substantial both in duration and in nature.

### 2.    Affirmative Defenses

Plaintiff moves for summary judgment on four of Defendants' remaining affirmative defenses, including (1) third party fault, (2) limitation of liability under 46 U.S.C. §§ 30501-30512, (3) willful misconduct of Plaintiff, and (4) a *McCorpen* defense. Dkt. 109 at 17.

### a.    Seventh Affirmative Defense: Third Party Fault

Defendants stipulate to the withdrawal of this affirmative defense. Accordingly, the Court grants summary judgment in favor of Plaintiff on this issue.

1
### b.    Twelfth Affirmative Defense: Limitation of Liability

2      The Court denies Plaintiff's motion for summary judgment on Defendants' twelfth

3  affirmative defense. Plaintiff argues that Defendants have failed to bring an action under

4  46 U.S.C. §§ 30501-30512 within six months after a claimant gives notice of a claim.

5  Dkt. 109 at 18. However, the six-month limitation does not apply when limitation of

6  liability is asserted as an affirmative defense in a responsive pleading.

7      Plaintiff also cursorily argues that Defendants "failed to provide any evidence

8  (whether in discovery responses, initial disclosures, or otherwise) that would support a

9  number of its defenses, including notably its seventh, twelfth, sixteenth, and nineteenth

10  defenses." Dkt. 109 at 18. However, in their motion, Plaintiffs offer no analysis on what

11  evidence is necessary or lacking for Defendants to satisfy their burden on this affirmative

12  defense. On summary judgment, "[t]he moving party bears the initial burden of showing

13  that there is no evidence which supports an element essential to the nonmovant's claim."

14  *Harris v. Extendicare Homes, Inc.*, C10-5752RBL, 2012 WL 1327816, at *1 (W.D.

15  Wash. Apr. 17, 2012) (citing *Celotex*, 477 U.S. at 322). Having failed to offer any

16  analysis on this issue, Plaintiff has failed to satisfy his initial burden in showing that

17  Defendants lack evidence on any essential elements of this defense. Therefore, the Court

18  denies summary judgment on this issue, although Plaintiff may later renew his motion

19  with supporting analysis.[1]

20

21
[1] In his reply, Plaintiff also argues that this affirmative defense should be stricken as a

22  sanction for spoliation of evidence. Dkt. 125 at 10–11. The Court refuses to address such an
   argument when raised in a reply brief on summary judgment. If Plaintiff wishes for the Court to

**c.     Sixteenth Affirmative Defense: Willful Misconduct of Plaintiff**

Plaintiff argues that there is no evidence to suggest that any misconduct on his part contributed to his alleged injuries. However, Plaintiff provides no analysis on what actions or behavior may be considered as willful misconduct contributing to his injuries. Evidence suggests that Plaintiff delayed seeking treatment of his alleged injury for approximately several months, during which time he continued to perform the physical labor of his position despite experiencing pain. If a jury determines that Plaintiff was concealing his injury during this time, it could rationally conclude that Defendant's own willful actions further contributed to his injuries.

He also indicates that there is no expert medical testimony to suggest that a willful delay in seeking treatment could have contributed to the injury. Dkt. 152 at 11. However, this argument was raised in Defendant's reply instead of his motion, and Plaintiff offers no legal analysis on whether such a defense requires expert medical testimony to show causation. Accordingly, the Court denies Plaintiff's motion for summary judgment on this defense.

Nonetheless, the Court notes that to the extent Defendants (1) have not yet disclosed potentially necessary expert testimony regarding such a defense, and (2) seek to use Plaintiff's smoking habit as evidence that Plaintiff willfully contributed to his injuries, Plaintiff may properly address these evidentiary issues in motions *in limine*. Moreover, to the extent that Plaintiff can provide legal authority showing that a lack of

---

entertain an argument on sanctions for alleged spoliation, he can so move in accordance with the applicable civil and local rules.

1  medical evidence precludes this affirmative defense, he may seek to renew this motion

2  with the proper analytical support.

3          **d.      Nineteenth Affirmative Defense: *McCorpen* Defense**

4          Plaintiff moves for summary judgment on Defendant's *McCorpen* affirmative

5  defense. "Under the so-called '*McCorpen*' defense, when a seaman is asked to disclose

6  pertinent information during a pre-hiring medical examination or interview and

7  intentionally conceals or misrepresents material facts, he is not entitled to an award of

8  maintenance and cure." *Coastal Villages Pollock, LLC v. Naufahu*, C13-1234-JCC, 2014

9  WL 1053126, at *4 (W.D. Wash. Mar. 19, 2014), *aff'd*, 14-35353, 2016 WL 5845732

10 (9th Cir. Oct. 6, 2016) (citing *McCorpen v. Central Gulf S.S. Corp.*, 396 F.2d 547, 549

11 (5th Cir. 1968)). The *McCorpen* defense is based on the principle that "[w]hen a seaman

12 signs aboard, he must have a good faith belief that he is reasonably fit for duty." *Burkert*

13 *v. Weyerhaeuser S. S. Co.*, 350 F.2d 826, 829 (9th Cir. 1965).

14         Here, no evidence suggests that Defendants performed a pre-hiring medical

15 examination or interview. Accordingly, it appears that Defendants must satisfy their

16 burden on this affirmative defense by showing that Plaintiff lacked a good faith belief

17 that he was fit for duty. Defendants provide evidence that Plaintiff had been previously

18 diagnosed with cervical spine injuries and related neuropathy. Dkts. 119-4, 119-5. While

19 the evidence that Plaintiff cites regarding his esteemed reputation as a good worker and

20 his arguments regarding the medical significance of his previous diagnosis are highly

21 persuasive, *see* Dkt. 125 at 12–13, the evidence of a preexisting condition is sufficient to

22 create a reasonable dispute of material fact that must be submitted to a jury.

1

# IV. ORDER

2      Therefore, it is hereby **ORDERED** that Defendants' motion for summary

3 judgment on the issue of punitive damages (Dkt. 108) is **GRANTED**. Plaintiff's motion

4 for partial summary judgment (Dkt. 109) is **GRANTED in part**, and **DENIED in part**

5 as stated herein.

6      Dated this 22nd day of December, 2016.

7

8

                                    BENJAMIN H. SETTLE
9                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22